301 Ga. 312
FINAL COPY

S17A0209. LYMAN v. THE STATE.

HINES, Chief Justice.

Inee Lyman appeals his convictions and sentences for malice murder, possession of a firearm during the commission of a felony, and conspiracy to commit armed robbery, all in connection with the shooting death of Christopher Lynn. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Lynn was shot and killed on September 20, 2010, behind a block of apartments. Earlier that

---

[1] The crimes occurred on September 20, 2010. On March 20, 2013, a Fulton County grand jury indicted Lyman, along with Zykia Adams, for: malice murder, felony murder while in the commission of aggravated assault, felony murder while in the commission of criminal attempt to commit armed robbery, aggravated assault with intent to rob, criminal attempt to commit armed robbery, and possession of a firearm during the commission of a felony; in separate counts, Lyman was charged with felony murder during the commission of the crime of possession of a firearm by a first offender probationer, possession of a firearm by a first offender probationer, and conspiracy to commit the crime of armed robbery; and, in a separate count, Adams was charged with conspiracy to commit the crime of armed robbery. Lyman was tried alone before a jury April 20, 2013 — May 3, 2013, and found guilty of all charges; on May 6, 2013, Lyman was sentenced to life in prison for malice murder, and consecutive sentences totaling 15 years for the crimes that were not merged or vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372-374 (4), (5) (434 SE2d 479) (1993). Lyman filed a motion for new trial on May 28, 2013, which he amended on September 11, 2015, and again on February 1, 2016; the motion, as amended, was denied on April 15, 2016. Lyman filed a notice of appeal on April 19, 2016. This appeal was docketed in this Court for the term beginning in December 2016, and orally argued on January 24, 2017.

day, Lynn and Joycelyn Patrick, who was Lynn's girlfriend and the mother of his child, together with Zykia Adams, engaged in a check-cashing scheme which involved the creation of a bank checking account, and then a series of cash withdrawals from that account at different branches of the bank in which the account had been established, totaling more than the $100 originally put into the account. Patrick and Adams had not previously known each other but were put into contact by a man known as "Little B," and Patrick provided the original $100. While executing the check cashing scheme, Patrick drove her car from bank branch to bank branch, with Lynn in the front passenger seat, and Adams in the back seat, behind the driver; Adams's infant was also in the car, in a car seat behind the front passenger, and Yolanda Napier, a friend of Adams's, was seated in the middle of the back seat, so she could take care of Adams's child when Adams was not in the car. When the group arrived at a bank branch, Adams would exit the car, go inside, and cash a check; whenever she returned to the car, Adams gave the money she had received from the bank branch to Lynn.

After cashing the last check at the last bank branch visited, Adams was given $100 as her share of the proceeds, but it was less money than she had

anticipated. On the way to the apartment complex where Adams wished to be let out, Adams sent a text message to a man and asked his help in getting her share of the proceeds. When the car arrived at the rear of the apartment complex, Lyman emerged from a building, approached the front passenger side window, grabbed Lynn by the shirt, pointed a pistol at his stomach, and demanded money. Lynn denied having any money, and exited the car; he struggled with Lyman for the gun, and Lyman shot Lynn eight times. Adams, who together with her child and Napier had emerged from the car, urged Lyman to shoot Patrick as well; Patrick had also exited the car. However, Lyman did not shoot her, and Patrick was able to flee the area.

Adams was named as a defendant in the same indictment as Lyman, and pled guilty to voluntary manslaughter; she was sentenced to 20 years in prison, and testified at Lyman's trial. She testified that, being displeased with the amount of money she was given from the cashed checks, after the last bank branch was visited, she sent a text message to a man named Moonk, and spoke with him on her cell phone; she told him to come and help her get the money she

believed she was owed, "or send somebody to get me my money."[2] At Moonk's instruction, Adams directed Patrick to drive to the rear of the apartment buildings; as they did so, they passed a group of men who Adams concluded were there to "jump on [Patrick], and that's what they were there for," but that did not happen. Rather, as the car stopped, it was Lyman who approached from somewhere behind it, went to the open passenger's window, produced a handgun, pointed it at Lynn, demanded the money, and, as Lynn attempted to get out of the car, shot him.

The State also presented the testimony of Quinton Hightower, who testified that he had known Lyman for two or three years, but had not spoken with Lyman the day before Lynn was killed, and had not seen Lyman on the day of the shooting; this was contrary to what he previously told an investigator, and Hightower was questioned about his prior statement. During that testimony, he admitted that he had told the investigator that: he had known Lyman for what "seems like" all his life; he had gone to middle school with Lyman; he was with

―――――――――――――――

[2] Adams's first statement to an investigator did not reveal anything regarding a text or phone call; in a subsequent statement, she identified Lyman as the man she contacted from the car. Finally, during her plea hearing, she identified Moonk as the man she had contacted by text and cell phone call from the car.

Lyman before the shooting; Lyman told him that he had "a lick," or a way to get some money, set up by a girl; Hightower was outside the apartment complex at the time of the shooting, and heard it; the shooting was at the back of the complex; he later heard Lyman "say he did it"; Lyman "told me he did it"; and, he picked Lyman's photograph out of an array. Hightower also testified that he told the investigator that which he believed the investigator wanted to hear for fear that his probation would be revoked otherwise, and that he did not want to be at Lyman's trial that day.

1. Lyman does not contest the legal sufficiency of the evidence of his guilt. Nevertheless, in accordance with this Court's general practice in appeals of murder cases, this Court has reviewed the record and concludes that the evidence at trial authorized the jury to find Lyman guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. The trial court instructed the jury that "[t]he testimony of a single witness, if believed, is sufficient to establish a fact. Generally, there is no legal requirement of corroboration of a witness provided you find the evidence to be sufficient." The trial court did not instruct the jury that, in a felony case in

which a witness is an accomplice, the testimony of the accomplice alone is not sufficient to warrant a conviction, and the testimony of the accomplice must be corroborated by other evidence. However, Lyman did not request such an "accomplice corroboration" instruction, or object to the failure to give one, and now asserts that the jury should have been informed that the testimony of Lyman's accomplice, i.e., Adams, had to have been corroborated.[3]

Under controlling precedent at the time of Lyman's trial, it was not error for the trial court to refuse to give an "accomplice corroboration" instruction, even if requested, when an alleged accomplice's testimony was "in fact corroborated by independent evidence. [Cits.]" *Hamm v. State*, 294 Ga. 791, 795 (2) (756 SE2d 507) (2014). And here, Adams's testimony was corroborated, primarily by Patrick's eyewitness account and Hightower's prior statement that Lyman admitted the commission of the crimes to him, and thus, under then-controlling precedent, no accomplice corroboration instruction was

---

[3] The court instructed the jury that in assessing the credibility of a witness, it was "authorized to consider any . . . negotiated pleas . . . or similar matters." Adams testified that she pled guilty to voluntary manslaughter, and received a sentence of 20 years in prison, in exchange for her truthful testimony against Lyman.

required. However, in *Hamm*, this Court addressed this previous precedent[4] and

concluded that, although evidence corroborating an alleged accomplice's

testimony may have been presented in a trial,

> the sufficiency of the evidence corroborating an accomplice's testimony, including whether the State has presented other witnesses to the same material facts as the accomplice, is an inquiry entirely distinct from whether a jury charge on the principle of accomplice corroboration is warranted. [It] is well-established that requested jury instructions must be given whenever there is "slight evidence" to support them. [Cit.] [Thus, when] there is slight evidence supporting a finding that a witness was an accomplice, the jury should be given proper guidance not only on how to decide whether the witness was in fact an accomplice but also on the extent to which it can rely on that witness' testimony by itself to support a conviction.

*Hamm*, supra at 796 (2). Accordingly, this Court overruled prior precedent, and

held that it is error "for a trial court to refuse to give a requested instruction on

accomplice corroboration so long as the State relies in part on other evidence

---

[4] The precedent addressed in *Hamm* was decided when former OCGA § 24-4-8 was in effect. As *Hamm* noted, the concepts contained in that former Code section were codified in the new Georgia Evidence Code at OCGA § 24-14-8, which was the Code section in effect at the time of Lyman's trial. OCGA § 24-14-8 reads:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.

connecting the defendant to the crime." Id. And, this Court specifically noted that when no request was made for such an "accomplice corroboration" instruction, reversal would be warranted only under the "plain error" standard. Id. at 798 n. 8. See also OCGA § 17-8-58 (b).[5] Thus, as Lyman did not request such a jury instruction, reversal depends on whether he can meet the plain error test.

This Court has previously stated the test for a finding of plain error.

First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error—discretion which ought to be exercised only if the error

---

[5] OCGA § 17-8-58 reads:

(a) Any party who objects to any portion of the charge to the jury or the failure to charge the jury shall inform the court of the specific objection and the grounds for such objection before the jury retires to deliberate. Such objections shall be done outside of the jury's hearing and presence.

(b) Failure to object in accordance with subsection (a) of this Code section shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. Such plain error may be considered on appeal even if it was not brought to the court's attention as provided in subsection (a) of this Code section.

seriously affects the fairness, integrity or public reputation of judicial proceedings. [Cit.]

*Cheddersingh v. State*, 290 Ga. 680, 683 (2) (724 SE2d 366) (2012) (Emphasis in original.). See also *Simmons v. State*, 299 Ga. 370, 373 (2) (788 SE2d 494) (2016). "Beyond showing a clear or obvious error, plain-error analysis requires the appellant to make an affirmative showing that the error probably did affect the outcome below." (Citation and punctuation omitted.) *Jones v. State*, 299 Ga. 40, 42-43 (2) (785 SE2d 886) (2016).

Lyman did not intentionally relinquish his right to an accomplice corroboration instruction, see *Cheddersingh*, supra at 684, and there is no question that the failure to give an accomplice corroboration instruction is error under *Hamm*, supra. But, as noted, *Hamm* had not been decided at the time of Lyman's trial, and controlling precedent at the time of trial did not require an accomplice corroboration instruction. The United States Supreme Court has made clear that, under Federal Rule of Criminal Procedure 52 (b), whether the trial court's asserted error is considered "clear or obvious" for purposes of the second prong of the plain error rule is a matter judged not by the state of the law when the asserted error was made (i.e., the time of trial), but by the state of the

law at the time of appellate review.  See *Henderson v. United States*, 568 U. S. 266, (II) (133 SCt 1121, 185 LE2d 85) (2013); *Johnson v. United States*, 520 U. S. 461, 468 (117 SCt 1544, 137 LE2d 718) (1997).  This Court has not directly stated that, in plain error review of jury instructions under OCGA § 17-8-58 (b), we will evaluate the "clear or obvious" element of the test based on the state of the law as it exists at the time of our review.  In *Choisnet v. State*, 295 Ga. 568, 572 (2) (761 SE2d 568) (2014), we "assum[ed] arguendo" that an asserted error was "plain" even though "the issue was unsettled at the time of trial," as the precedent clarifying the proper jury charge was issued after trial (and shortly before the denial of the motion for new trial in *Choisnet*).  More recently, in *Stanbury v. State*, 299 Ga. 125, 129 (2) (786 SE2d 672) (2016), we applied, without comment, the holding in *Hamm* to determine that the "clear or obvious" element of the plain error test was met, even though *Hamm* was issued after Stanbury's trial.  We now take this opportunity to state distinctly that when conducting review of asserted plain error under OCGA § 17-8-58 (b), just as under Federal Rule of Criminal Procedure 52 (b), whether an error is "clear or obvious" is judged at the time of the appellate court's review.

We reach this conclusion by examining our own precedent.  When this

Court adopted the plain error rule in *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011), we stated that

> [g]iven that OCGA § 17-8-58 (b) adopts Rule 52 (b)'s language almost verbatim, we believe our Legislature intended, in the context of jury instruction errors, to embrace the federal plain error standard as stated in Rule 52(b) and clarified in [*United States v. Olano*, 507 U. S. 725 (II) (113 SCt 1770, 123 LE2d 508) (1993)] and its progeny.

Id. Recognizing that *Johnson*, supra, was existing progeny of *Olano* at the time we made that statement, and that *Henderson*, supra, is based upon *Johnson*'s conclusion that "plain error" includes that which is recognized as error at the time of appeal, even though it was clearly *not* considered error under precedent controlling at the time of trial, looking at persuasive federal authority, we reach the same conclusion under our plain error rule as the United States Supreme Court did in *Henderson* under Rule 52 (b); whether an error is considered "clear or obvious" under the second prong of the plain error test is judged under the law existing at the time of appeal, regardless of whether the asserted error in the trial court was plainly *incorrect* at the time of trial, plainly *correct* at the time of trial, or an *unsettled issue* at the time of trial. Accordingly, *Hamm* applies to Lyman's appeal. And, under that authority, the failure to give a corroborating

11

accomplice instruction is clear error, and Lyman meets the second prong of the plain error test.[6]

However, Lyman does not meet the third prong of the plain error test, as he fails to establish that omitting the instruction probably affected the outcome of his trial. *Jones*, supra. Lyman relies upon *Stanbury*, supra, to support his assertion that omitting the instruction affected the verdicts. In that case, it was noted that the omission of the accomplice corroboration instruction

> impermissibly empowered the jury to find Stanbury guilty based solely on McKenzie's accomplice testimony . . . because he was the only witness who affirmatively identified Stanbury as the second man inside the house who robbed and shot [the victim].

Id. at 130-131 (2). Here, however, there was not merely one alleged accomplice of Lyman's (i.e., Adams) who "affirmatively identified" him as the man who shot Lynn; rather, Patrick supplied her eyewitness testimony and identification of Lyman as the shooter, and evidence of Hightower's statement to a law enforcement investigator relating Lyman's admission of the murder was also provided to the jury. Similar evidence was not presented in *Stanbury*; indeed, in that opinion, this Court specifically stated that

---

[6] We note that in this case, plain error is evaluated under OCGA § 17-8-58 (b), not OCGA § 24-1-103 (d). But see *Crayton v. State*, 298 Ga. 792, 799-800 (5) (784 SE2d 343) (2016).

> when a defendant is affirmatively identified as the . . . gunman in a murder based *solely* on accomplice testimony [it] undermines the fairness of the proceeding [due to the failure to give the accomplice corroboration instruction].

Id. at 131. (Emphasis in original.) Thus here, had the jury received a proper instruction, it would have had to reject evidence from two separate sources in order to find that Adams's testimony was not corroborated. In similar circumstances, *Hamm* determined that the failure to give an accomplice corroboration instruction was harmless as Hamm made an admission, to someone other than the accomplice, that he had killed someone and that a prostitute in his control had "set up a lick"; additionally, he was seen with a weapon of the type used in the killing, and thus, it was highly likely that had the jury received an accomplice corroboration instruction, a guilty verdict still would have resulted. Id. at 797-798.

Lyman notes that during closing argument, the prosecutor stated that he believed that the court would instruct the jury that the testimony of a single witness, if believed, would be sufficient to prove guilt beyond a reasonable doubt, and argued that this was an important principle so as to avoid the requirement that everyone "walk around with a friend at all times [so that]

13

someone sees exactly what[ever]" happens, so that person could testify to those facts if one becomes the victim of a crime. Although Lyman asserts that this exacerbated the failure to give an accomplice corroboration instruction, in fact, the thrust of this portion of the prosecutor's argument was that the jury did not need to believe any single witness; the prosecutor closed this portion of the argument by saying that "[i]n this case, we have multiple witnesses that saw the same thing. There were multiple witnesses that saw the same thing."

Lyman further notes that, shortly after the jury began deliberations, it asked if it could be provided with a transcript or recording of Hightower's interview with the investigator, as well as a copy of Patrick's written statement; the jury was instructed that it had been provided with all the evidence in the case. However, after that response, and less than three-and-a-half hours after the jury had begun deliberations, the jury asked the court how long it had to deliberate before it could be considered a hung jury: at this point the court responded, by note, that the jury should continue to deliberate; four minutes after the court's note was sent to the jury, the jury responded, by note, that it was split 7-5, stated that copies of the statements of Hightower and Patrick "would help," and expressed confusion over why it had in its hands a copy of

Hightower's written acknowledgment that a video recording of his statement was being made, but no video of that statement; the court responded, again by note, that the jury must decide the case based upon the evidence before it;[7] and, less than an hour-and-a-half after this note from the court, the jury informed the court that it had reached its verdicts.[8]

Lyman contends that this sequence of events shows that, had the court given an accomplice corroboration instruction, his attempted impeachment of Patrick's testimony based upon "inconsistencies" between her prior statement and her trial testimony,[9] together with the fact that Hightower denied the truth

---

[7] In discussing the court's response to this note, it was recognized by the parties and the court that no copy of Patrick's first written statement to investigators, and no recording of Hightower's statement, had been admitted into evidence, or played for the jury, during trial. At all times that the court addressed the jury's notes, Lyman was present, as were his counsel and the prosecutor.

[8] After the jury returned its verdicts finding Lyman guilty on all counts of the indictment, the jury was polled, and each juror stated that the verdicts reached were those they reached in the jury room, were freely and voluntarily made, and were still their verdicts.

[9] In cross-examination, Lyman asked Patrick whether she had told an investigator in her original statement that the shooter came from "apartment 7," noting that in her direct testimony at trial, she testified that he came from behind the car; Patrick responded that she had originally said that it "looked like" he came from that apartment, that the door to that apartment — which Adams had identified as her aunt's — appeared to be open when they passed it, but that the shooter had come from that direction. Lyman also elicited Patrick's testimony that she told the investigator that the shooter had a slim build, and argued at trial that Lyman's build is not "slim." Lyman also argued to the jury that Patrick's version of events differed from that of Adams and Napier in the type of turn executed by the car before the shooting, and that Patrick had stated the color of Lyman's hat to be blue or black, when a red one was found on the ground after the shooting.

15

of his prior statement to an investigator, makes it likely that a different result would have occurred. But, the court instructed the jury regarding its role in determining the facts and resolving evidentiary issues, as well as its role regarding the principles of identity and witness reliability as it pertains to identification and credibility. In light of the jury instructions viewed as a whole, see *Campbell v. State*, 292 Ga. 766, 769 (3) (740 SE2d 115) (2013), and the corroboration of Adams's testimony presented at trial from two separate sources, we find that Lyman has not met his burden of affirmatively showing that the failure to give an accomplice corroboration instruction probably affected the outcome of his trial. *Jones*, supra; *Cheddersingh*, supra.

3. Lyman contends that his trial counsel failed to provide effective assistance in several respects. In order to prevail on any such claim, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions

16

were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, id. at 784, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course. *Redding v. State*, 297 Ga. 845, 850 (5) (778 SE2d 774) (2015). To meet the second prong of the test, Lyman must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. *Smith*, supra at 783. "'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

(a) Lyman asserts that trial counsel was ineffective in failing to request a jury instruction on accomplice corroboration. See Division 2, supra.

> In making litigation decisions, there is no general duty on the part of defense counsel to anticipate changes in the law, and only in a rare case would it be ineffective assistance by a trial attorney not to make an objection that would be overruled under prevailing law. Although this Court has held that a new decision applies to the

admission of evidence in cases pending on direct review at the time that opinion was issued, that does not alter the long-standing precedent that, when addressing a claim of ineffectiveness of counsel, the reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial. Thus, a new decision does not apply in a manner that would require counsel to argue beyond existing precedent and anticipate the substance of the opinion before it was issued. [Cit.]

*Williams v. Rudolph*, 298 Ga. 86, 89 (777 SE2d 472) (2015). As noted in Division 2, supra, at the time of Lyman's trial, *Hamm*, supra, had not yet been decided, and the controlling precedent was "that there is no error in declining to give an instruction on accomplice corroboration, even if such a charge is requested, where the accomplice's testimony is in fact corroborated by independent evidence." Id. at 795. And, Adams's testimony that Lyman was the man who shot Lynn was corroborated by evidence from two sources. To the extent that Lyman's argument is that trial counsel could have, and should have, requested an accomplice corroboration instruction under then-existing precedent, as noted above, see Division 2, supra, it is unlikely that the omission of the accomplice corroboration instruction affected the outcome of Lyman's trial. *Smith*, supra. Compare *Fisher v. State*, 299 Ga. 478, 486-488 (2) (b) (788 SE2d 757) (2016).

(b) Lyman contends that trial counsel was ineffective in consenting to the withdrawal of a limiting instruction regarding the use of Lyman's status as a first offender probationer as regards the count of the indictment charging him with possession of a firearm by a first offender probationer, asserting that the jury was thus allowed to use his status as a first offender probationer against him generally. However, Lyman does not show exactly what requested instruction was under the trial court's consideration during the charge conference, see OCGA § 5-5-24 (b), and it is not discernible from the transcript of the charge conference what language was considered by the court, although it does appear that the court decided that some language under consideration was unnecessary, a decision to which counsel acquiesced. Counsel had previously stipulated to Lyman's probationary status to avoid having the jury exposed to details regarding the prior offense that resulted in his probationer status, and the court instructed the jury that "Lyman is an active first-offender probationer as it relates to count 10 of the indictment" (i.e., the charge of possession of a firearm by a first offender probationer).[10] In light of such circumstances, Lyman fails

---

[10] In Count 8 of the indictment, Lyman was charged with the crime of felony murder during the commission of the crime of possession of a firearm by a first offender probationer. See footnote 1, supra.

19

to show prejudice resulting from counsel's decision of which he now complains. See *Hanes v. State*, 294 Ga. 521, 525-526 (4) (b) (755 SE2d 151) (2014).

(c) Lyman further contends that trial counsel was ineffective in failing to object to an exhibit going out with the jury that was not actually entered into evidence; he describes the exhibit as the form that Hightower signed acknowledging that he understood that his interview with the investigator was being video recorded. However, Lyman has not caused the exhibit at issue to be placed in the record on appeal, making it difficult to either show that there was any deficiency on counsel's part, or to meet his burden to show that prejudice resulted from counsel's alleged deficiency. See *Hayes v. State*, 298 Ga. 98, 106 (2) (d) (779 SE2d 609) (2015). In any event, even if the exhibit was as described by Lyman, there is no indication that it contained any testimonial information, or was otherwise harmful to his defense. See *Dockery v. State*, 287 Ga. 275, 276-277 (4) (695 SE2d 599) (2010).

(d) Finally, Lyman asserts that the cumulative effect of trial counsel's alleged errors deprived him of effective assistance of counsel. Of course, on appeal, this Court evaluates "only the effects of matters determined to be error, not the cumulative effect of non-errors." *Bulloch v. State*, 293 Ga. 179, 183 (2)

(744 SE2d 763) (2013) (Citation and punctuation omitted.). But, even if we consider the instances Lyman raises to be examples of deficient performance, "we conclude that those deficiencies would not in reasonable probability have changed the outcome of [the trial]." *Barrett v. State*, 292 Ga. 160, 189 (3) (e) (733 SE2d 304) (2012).

Judgments affirmed. All the Justices concur.

Decided May 15, 2017 — Reconsideration denied June 5, 2017.

Murder. Fulton Superior Court. Before Judge Markle.

Matthew K. Winchester, for appellant.

Paul L. Howard, Jr., District Attorney, Paige Reese Whitaker, Marc A. Mallon, Lyndsey H. Rudder, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General, for appellee.