**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 23, 2017**

# In the Court of Appeals of Georgia

A17A0117. LAWRENCE v. THE STATE.

MCMILLIAN, Judge.

Appellant Kendell Lawrence was convicted of armed robbery, kidnapping, rape, aggravated sodomy, and possession of a firearm during the commission of a felony, involving two successive victims on the same night. After the trial court denied Lawrence's motion for new trial, as amended, Lawrence then filed this appeal. Finding no error, we affirm.

Lawrence began his crime spree on the evening of December 8, 2011. Sometime between 6:00 and 7:00 p.m., M. M. exited a MARTA bus on Old National Highway near her home and walked to a convenience store, where she purchased snacks using her EBT debit card.[1] After she made her purchases, she started walking down toward

---

[1] EBT debit cards are issued to food stamp recipients.

her neighborhood when she noticed a vehicle, which she said looked older and was "loud," speed past her, and a short time later she noticed a man walking toward her. As the man approached her, he told her not to do anything crazy, and she heard a clicking sound, which she said sounded like a gun being cocked. The man asked her if she had money, and she told him she did not have any cash. He then blindfolded her, grabbed her arm, and walked her across the street to a vehicle where they both got into the back seat. After someone else started driving the car, they took her cell phone from her pocket, and then the person in front instructed the person next to her to have her lie down so she did.

M. M. testified that the car came to a stop about seven to ten minutes later, and she was told to exit the vehicle. M. M. remained blindfolded, but she said that it felt like she was walking through a wooded area down a gravel or dirt road. After a minute they came to a house, and the men helped her crawl through a window to get inside, where she noticed a musty smell. The men walked her upstairs where he instructed her to take off her "bottoms," which she did. The men then took turns sexually assaulting her vaginally and orally, and M. M. testified that when one of the men put his penis in her mouth, she tasted rubber that she thought was from a condom. A short time later,

2

the men made her use a douche and also gave her a wet washcloth so she could wash out the inside of her mouth. When she finished, she was told to get dressed.

At some point, the men also asked the victim if she had any money on her EBT card, and they took the card and her backpack. She said they helped her crawl back out the window, and they got back in the car and drove her back to the area where they had abducted her. They removed the blindfold and pointed her in the direction they wanted her to walk and told her not to look back. After she heard them driving away, she ran into a nearby business where she told them she had been robbed and asked for a phone to call police and her boyfriend. Her boyfriend and her mother arrived, and M. M. was transported to Grady, where she underwent a sexual assault examination.

Later that same night, the second victim, L. W., went to a bar where she worked to meet friends for drinks. She said it was approximately 11:00 p.m. when she arrived, and she parked in a lighted area where she sat in her car to wait on her friends. While she was waiting, she took about $600, her wallet, and credit cards and placed them in the glove box because she did not want to take them inside the bar with her.

When L. W. saw her friend's car pull into the parking lot, she opened her car door and started to exit her vehicle. She noticed a "raggedy sounding" faded red or burnt orange older model "rodeo" or similar type vehicle pulling into the parking lot.

3

As she was locking her car door from the outside, a man, who she described as approximately five feet seven inches tall and brown skinned, approached her and asked for a cigarette. When she reached for a cigarette, she felt him put a gun to her side. She offered him her purse, and he told her to open the car and that he knew that she had something inside the car. He then told her to get back inside her car, and as she complied, she heard the noisy vehicle she had noticed earlier start up again. She said she was crying and her hands were still shaking so badly she could not drive, and he told her to "get it together," or that he would kill her.

L. W. started driving, with the man giving her directions to drive to Old National Highway. He also went through the glove box and took out the money she had placed there. The man also instructed L. W. to go to the ATM to withdraw money from her account with her check card, which she did.

L. W. returned to Old National Highway, and the man continued to give her directions about where to drive. After about ten minutes, they drove into a residential neighborhood where she noticed a distinctive sign, and they turned onto a dead-end road and came to a stop. The man instructed her to turn off the lights and the car, and she heard someone tapping on the passenger window next to where the man was seated. The man opened the window, and she heard him speaking to the another man,

4

who said they should "dead her." The men then blindfolded her. The second man, who L. W. described as having a deeper voice, then came around to the driver's door, opened it, took L. W. by the arm, and lifted her out of the car. She testified she felt one of the men place a gun against her back, and she could tell when they left the paved surface and began walking on something crunchy, which she saw was pine straw when she peered under her blindfold.

Eventually, she could hear a window being raised, and she was assisted in stepping through. After leading her up some stairs, they took her to a room where they told her to undress. She said that she could tell the floor in the room was carpeted and that it was damp[2] and had an odor like it was old. The men then took turns sexually assaulting her vaginally and orally. After the men finished with her, the deeper voiced man inserted something into her vagina, and she could feel the liquid going in and running down her legs. She then heard what sounded like water being squeezed out of a wet towel, and she felt someone put the towel in her mouth and wipe out the inside of her mouth. She said that she was then cleaned front to back around her vagina and "behind." They repeated the process, and then they helped her put on her clothes.

---

[2] The wet floor was consistent with L. W. being taken to the same spot where M. M. had been raped and forced to douche and wash earlier in the evening.

The softer voiced man then took L. W. back to her car, told her to count to 100, and allowed her to drive away. She drove back to the bar where she worked, found her manager there, and called 911. The police came and she was transported to the hospital, where a sexual assault examination was performed.

After she left the hospital with a male friend who had met her there, she told him that she wanted to retrace her steps to see if she could find where the men had taken her. They were able to find the place where she thought she had been taken, which turned out to be part of the Pine Tree Trail Condominium complex. There, they found that the police were already at the location based on her description of where the men had taken her. She showed police the unit where she had been taken and then took them to the room where she had been raped. She testified there were visible wet spots on the floor where she had been made to douche, and a police investigator said that the physical condition of the location was consistent with what the victim had told police, including the fact that there was no running water inside the condo.

The evidence also showed that at that time, Lawrence was living in unit 1113 of the Pine Tree Trail condominium complex with his father and father's girlfriend, Jasmine Morgan. The evidence also showed that he owned a red Isuzu SUV, which was usually parked in front of their condo. Deantwan Allen also lived in the

6

condominium complex with his girlfriend, Ashley McDaniel, and her family. Allen and Lawrence were close friends and were often together.

McDaniel, her mother, and Jasmine Morgan each testified and/or gave statements to police about the events of December 8, 2011. McDaniel's mother testified that she was walking home from the bus stop after work when Allen and Lawrence drove by in Lawrence's vehicle and asked her if she wanted a ride. She accepted and they dropped her off outside her condo. McDaniel confirmed that she saw Allen when she looked out the window as Lawrence was dropping off her mother around 5:00 to 6:00 p.m. She did not see Allen again until the next day.

Morgan testified that on the night of December 8, 2011, she was home alone and had fallen asleep on the sofa watching television. She woke up as she heard someone come into the house and go into the kitchen. She got up and looked outside and did not see Lawrence's red Isuzu parked in its usual spot in front of the condo, but when she went upstairs and looked, she saw it was parked farther away than normal, more up the hill. She testified that the unit next door to their unit was empty and had been so for a number of years.

In her statement to police, Morgan recalled additional details about that night, including that the person who came in used a key to enter the condo, and that she heard

them go into the kitchen and then leave a short while later. She said that she asked Lawrence about it the next day, and he told her that he had given the key to Allen to come into the house. She also told police that she had seen Allen with a firearm.

L. W. later met with a Georgia Bureau of Investigation sketch artist to create a sketch of the softer voiced man who had approached her in the parking lot and abducted her.[3] Shortly after the incident, McDaniel's mother saw a sketch on the news that she thought might look like Allen, and McDaniel looked at it also. She testified at trial that she asked Allen about the sketch that was on television. Initially, she testified only that he told her not to worry about it and, at first, continued to deny that he said anything specific about Lawrence's involvement, but after repeatedly being refreshed with her statement to police, McDaniel recalled telling police that Allen had told her that he got caught up in something with Lawrence, that a girl was robbed and raped, and that it was Lawrence who raped the girl.

Evidence was also presented that the forensic samples collected in the sexual assault examinations performed on L. W. failed to reveal the presence of any human male DNA, which the examiner explained could be the result of her being forced to

---

[3] L. W. never saw the other man's face and was unable to make any identification of him to police.

8

wash or the use of condoms. Human male DNA was detected on some of the swabs obtained from M. M., though, and this DNA was subsequently found to match Allen's profile. L. W. also identified Allen from a photographic line up, and M. M.'s phone was found under his mattress in the condo where he lived with McDaniel. L. W. was also able to identify Lawrence's vehicle as the one used in her abduction, and upon searching it, the police found the EBT receipt from M. M.'s purchase at the convenience store on Old National Highway.

1. Lawrence first contends that the trial court erred by allowing McDaniel to testify that Allen told her that Lawrence raped the women,[4] arguing that the statements were hearsay and not subject to the co-conspirator exception.[5] OCGA § 24-8-801 (d) (2) (E) provides that "[a]dmissions shall not be excluded by the hearsay rule," and defines an "admission" as including a statement offered against a party which is

---

[4] A recording of a numerous telephone conversations between Allen and McDaniel made while he was in jail were played for the jury, and during one call he also implicated Lawrence. Lawrence does not specifically and separately challenge the admission of this recording.

[5] A motion in limine was filed seeking a ruling on this issue prior to trial. On appeal, Lawrence does not contend that the State failed to prove that a conspiracy existed or that the conspiracy included Allen and Lawrence.

[a] statement by a coconspirator of a party during the course and in furtherance of the conspiracy, including a statement made during the concealment phase of a conspiracy. A conspiracy need not be charged in order to make a statement admissible under this subparagraph.

The trial court found the statements Allen made to his girlfriend were made during the concealment phase of the conspiracy and that the statement was admissible even if the girlfriend who testified about Allen's statement was not part of the conspiracy. On appeal, Lawrence asserts that the exception does not apply because the trial court erroneously found that the girlfriend was a co-conspirator and, in any event, the statement was not made in furtherance of the conspiracy.

We begin our analysis by considering the text of OCGA § 24-8-801 (d) (2) (E). *Mahalo Investments III, LLC v. First Citizens Bank & Trust Co., Inc.*, 330 Ga. App. 737, 738 (769 SE2d 154) (2015). Contrary to Lawrence's assertions, nothing in the text of the statute requires that McDaniel as the testifying witness also be a co-conspirator for the exception to apply. See Ronald L. Carlson & Michael Scott Carlson, Carlson on Evidence 560 (4th ed. 2016) ("In fact, Rule 801 (d) (2) (E) does not necessitate that the witness testifying to co-conspirator statement be a co-conspirator, instead only requiring that the *declarant* be a co-conspirator.") Because it is undisputed that Allen

was a conspirator, whether McDaniel was also a co-conspirator is not material to our analysis of whether Allen's statement to McDaniel falls within the co-conspirator exception.

We now turn to the question of whether Allen's statement was made in furtherance of the conspiracy. OCGA § 24-8-801 (d) (2) (E) specifically provides that statements made during the concealment phase of the conspiracy are "in furtherance of the conspiracy." And our Supreme Court has held that "[f]or purposes of the hearsay exception, a conspiracy is deemed to endure so long as the parties thereto attempt to conceal either the crime or the identity of the perpetrators." (Citation and punctuation omitted.) *Terrell v. State*, 300 Ga. 81, 85-86 (2) (793 SE2d 411) (2016) (decided under former OCGA § 24-3-5).[6]

_____

[6] Prior to the enactment of the New Evidence Code, Georgia's co-conspirator exception to the hearsay rule was found in former OCGA § 24-3-5, which provided: "After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." Notably, former OCGA § 24-3-5 did not explicitly require that the statement to be "in furtherance" of the conspiracy to be admitted. See Paul Milich, Courtroom Handbook on Georgia Evidence, Co-Conspirator's Statements (April 2017) ("Georgia cases under the pre-2013 rule usually ignored the 'in furtherance requirement' that defined the exception at common law."). Thus, caution is required before applying cases construing former OCGA § 24-3-5 in analyzing the co-conspirator exception now codified at OCGA § 24-8-801 (d) (2) (E). See *Peoples v. State*, 295 Ga. 44, 51(4) n.4 (757 SE2d 646) (2014) (noting that former OCGA § 24-3-5 is broader than Federal Rule of

11

Although Lawrence acknowledges that concealment may be part of a conspiracy, he asserts that the particular statement was not made in furtherance of the conspiracy because Allen merely sought to assign blame to someone else for the crimes. See *United States v. Blakey,* 960 F2d 996 (11th Cir. 1992). However, *Blakey* is readily distinguishable. The co-conspirator in *Blakey* made the incriminating statements to the bank's fraud investigator, which, as the Eleventh Circuit held, was made to shift the focus of the forged check investigation away from himself to the other conspirator. Id. at 999.

In contrast, Allen made the statement to his girlfriend after she became suspicious of his involvement in the crime. By attempting to minimize the extent of his involvement, Allen was trying not only to mollify his girlfriend but also to dissuade her from going to police, which in turn furthered the aim of covering up both men's involvement in the crime. See *Grimes v. State*, 296 Ga. 337, 346 (2) (a) (iii) (766 SE2d 72) (2014) ("The concealment phase was ongoing because the statements in question were not made to police, the investigation was ongoing, and the other conspirators . .

---

Evidence 801 (d) (2) (E) and that our new OCGA § 24-8-801 (d) (2) (E) generally tracks the federal rule).

. were still at-large."). It can hardly be doubted that concealing their identities was one of the primary aims of the conspiracy as demonstrated by the fact that they blindfolded the victims and took great efforts to remove any DNA from the victim's bodies. Accordingly, Allen's statement was properly admitted under OCGA § 24-8-801 (d) (2) (E).

2. Lawrence also contends that the trial court erred by failing to instruct the jury on the necessity of accomplice corroboration under OCGA § 24-14-8 because the only direct evidence that he committed the crimes was McDaniel's testimony that Allen told her that Lawrence committed the rapes. Lawrence acknowledges that although he objected when the trial court indicated its refusal to give the charge at the charge conference, he did not voice any objection to the failure to charge following the trial court's instructions to the jury, and thus the refusal to charge will be reviewed only for plain error. *Merritt v. State*, 292 Ga. 327, 330 (2) (737 SE2d 673) (2013) (objection at charge conference does not preserve objection to charge as subsequently given); *Carruth v. State*, 290 Ga. 342, 347-48 (6) (721 SE2d 80) (2012) (same); *Jones v. State*, 340 Ga. App. 568, 573 (4) (798 SE2d 87) (2017).

In reviewing a failure to charge for plain error, "we will reverse the trial court only if the instructional error was not affirmatively waived . . . , was obvious beyond

13

reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Herrington v. State,* 300 Ga. 149, 151 (2) (794 SE2d 145) (2016)*; Ferguson v. State*, 335 Ga. App. 862, 870 (3) (783 SE2d 380) (2016)*.*

It is true that our case and statutory law plainly require a charge on corroboration when an accomplice is the only witness testifying about an inculpatory fact. And Lawrence correctly points out that our Supreme Court has specifically determined that the failure to do so may under certain circumstances constitute plain error necessitating a retrial. See *Stanbury v. State*, 299 Ga. 125, 129 (2) (786 SE2d 672) (2016). However, we have found no direct authority, and Lawrence has cited none,[14] in which our

_____

[14] In his reply brief, Lawrence cites cases in which this Court has considered evidentiary sufficiency challenges based on lack of corroboration of an accomplice's statement that were admitted through the "third hand" testimony of other witnesses. But none of these cases plainly address the issue of whether the trial court was required to instruct the jury on the necessity of corroboration of the witness's testimony about the accomplice's inculpatory statement. See *Adams v. State*, 191 Ga. App. 16, 18 (3) (381 SE2d 69) (1989) (corroboration necessary when accomplice's statement to police was admitted at trial out of necessity); *Davis v. State*, 178 Ga. App. 760, 762 (2) (344 SE2d 730) (1986) (issue was whether accomplice's prior inconsistent statement implicating defendant was sufficiently corroborated); *McCauley v. State*, 177 Ga. App. 426 (339 SE2d 399) (1986) (co-conspirator's prior inconsistent statement was the only evidence linking defendant to the crime and thus reversal required when no corroborating evidence); *McDonnell v. State*, 166 Ga. App. 530, 531 (2) (304 SE2d 733) (1983) (issue was whether prior oral statements of accomplice admitted as substantive

appellate courts have held that an accomplice corroboration charge must be given when, as here, Allen's statement is introduced by another witness and he does not testify at trial.[15] And OCGA § 24-14-8, upon which the accomplice corroboration charge is based, applies by its own terms when "the only witness is an accomplice," and thus also does not clearly answer the question of whether a corroboration charge is required under the circumstances of this case.[16] Because it is not "obvious beyond reasonable dispute" from either controlling precedent or the clear text of a statute, we find that Lawrence has failed to establish that the trial court plainly erred by failing to give this charge. See *Stanbury*, 299 Ga. at 129 (2).

---

evidence were properly corroborated). Although these cases stand for the proposition that an accomplice's statement must be corroborated even when it comes in through the testimony of third parties, the issue of whether an accomplice corroboration charge was or should have been given was not raised or addressed. As we have explained on numerous occasions, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Palmer v. State*, 282 Ga. 466, 468 (651 SE2d 86) (2007).

[15] We note that our Supreme Court has recently held that "when conducting review of asserted plain error under OCGA § 17-8-58 (b), . . . whether an error is 'clear or obvious' is judged at the time of the appellate court's review." *Lyman v. State*, S17A0209, 2017 Ga. LEXIS 376, at *11 (2) (May 15, 2017).

[16] We note that although the trial court found that McDaniel may have become a co-conspirator, the trial court did not find that she was an accomplice.

3. Lastly, Lawrence argues that without the testimony concerning the hearsay statement Allen made to McDaniel about his involvement, the evidence is insufficient to support his convictions. However, as set out in Division 1, we have determined that the trial court did not err in admitting this testimony. Moreover, we have independently examined and described the evidence presented at trial and find it was more than sufficient to authorize a jury to find Lawrence guilty of the crimes charged. See *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Accordingly, Lawrence is not entitled to reversal on this basis.

*Judgment affirmed. Barnes, P. J., and Mercier, J., concur.*