## S11A0803. SIMPSON v. THE STATE.
(715 SE2d 142)

THOMPSON, Justice.

Appellant Gregory Bernard Simpson appeals from a murder conviction in connection with the stabbing death of Patricia Simmons.[1] He asserts, inter alia, that his trial counsel was ineffective for failing to object to the trial court's admission of his bloodstained clothes without showing a chain of custody. We find no error and affirm.

Appellant and Simmons had been involved in a troubled relationship. Simmons was living with appellant and his family when appellant began using cocaine. Simmons moved away, and began living with a close friend, Connie Quinn. During this time, Simmons continued to see appellant, who frequently stayed the night at Quinn's trailer. As appellant's cocaine addiction worsened, Simmons demanded that appellant either stop using drugs or stop seeing her. Appellant checked himself into a rehabilitation facility, but left two weeks later. From that point forward, appellant began acting aggres-

---

[1] The crimes occurred on March 6, 2007. On May 30, 2008, a McIntosh County grand jury indicted appellant with one count each of malice murder, aggravated assault, and felony murder in the commission of an aggravated assault. Appellant's trial commenced September 28, 2009, and ended with a jury verdict finding him guilty on all counts. Appellant was sentenced to life in prison for malice murder; the remaining counts were merged and vacated by operation of law. *Malcolm v. State*, 263 Ga. 369 (434 SE2d 479) (1993). Appellant timely filed a motion for new trial, which was denied on November 9, 2010. A notice of appeal was filed on December 9, 2010. The appeal was docketed during the April 2011 term of this Court, and was orally argued on May 9, 2011.

sively toward Simmons.

Appellant began going to Quinn's trailer uninvited, letting himself in against the wishes of Quinn and Simmons. He continued to stay at Quinn's residence and spent his nights pacing around the trailer, looking through cabinets and drawers, and making noise. During the months preceding Simmons' murder, both Quinn and Simmons became fearful that appellant would harm them while they slept.

In the days before the murder, tensions between Simmons and appellant escalated dramatically. Appellant broke into the trailer several times and took Simmons' money. Once, he broke in while Simmons was present and held her in her room at knife-point, prohibiting her from leaving the room. On another occasion, he attempted to rape Simmons, again at knife-point, and cut the phone lines to the house when she tried to call for help. During this period, appellant was heard repeatedly saying, "That's my baby. If I can't have her, nobody can have her." Despite these attacks, and several calls to the police, Simmons refused to seek a protective order against appellant.

On the day of the murder, Simmons spent most of the day at a neighbor's house because she was afraid to be alone. After returning home late in the evening, Simmons called Quinn at work to tell Quinn that she was preparing their dinner. Ten minutes later, Quinn tried calling Simmons back and found that the phone was off the hook. Afraid for her friend, Quinn rushed home and found Simmons' body on the floor of the trailer. Simmons had been stabbed over 100 times and had bled to death.

When police first located appellant on the night of the murder, he was considered a person of interest in the case, but not yet a suspect. Appellant, who was high on crack cocaine at the time, agreed to go to the police station for questioning. While there, police told appellant that he was free to go if he agreed to let the police inspect his clothes. Appellant agreed and, upon inspection, police found a blood stain on his pants. At that point, appellant was arrested without a warrant, by an unidentified officer, and his clothes were confiscated for testing. Once seized, appellant's clothes were kept in a brown paper bag which was not sealed and for which no chain of custody was kept. Blood stains on appellant's clothes matched Simmons' DNA and DNA found at the scene of the crime was matched to appellant.

1. We find the evidence in this case was sufficient to sustain appellant's convictions on all counts under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Appellant first asserts that the arresting officer did not have probable cause to arrest him, and therefore, the statements appel-

lant made at the police station and the bloody clothes seized from him should have been suppressed. In evaluating the legality of a warrantless arrest, we need only to ask whether the arresting officer had "probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U. S. 146, 152 (125 SC 588, 160 LE2d 537) (2004). At the heart of a probable cause determination is the question of whether the totality of the circumstances lend themselves to " 'a reasonable ground for belief of guilt.' " *Maryland v. Pringle*, 540 U. S. 366, 371 (124 SC 795, 157 LE2d 769) (2003) (quoting *Brinegar v. United States*, 338 U. S. 160 (69 SC 1302, 93 LE 1879) (1949)).

In this case, because the arresting officer was unknown, we cannot find probable cause unless we can attribute it to any officer that could have made the arrest. The record shows that, on the night of Simmons' murder and appellant's arrest, every uniformed officer in the city was briefed on appellant's acts of violence toward Simmons in the prior few days, as well as statements made by Quinn in a 911 phone call that blamed appellant for killing Simmons, and reports that a person fitting appellant's description was seen angrily banging on Simmons' door shortly before the murder.

"Probable cause exists if the arresting officer has knowledge and reasonably trustworthy information about facts and circumstances sufficient for a prudent person to believe the accused has committed an offense." *Devega v. State*, 286 Ga. 448, 451 (689 SE2d 293) (2010) (quoting *Brown v. State*, 262 Ga. 728, 729 (2) (425 SE2d 856) (1993)). Because the record shows that every police officer that was on duty that day had actual knowledge of facts sufficient to support a finding of probable cause, the seizure of appellant's bloody clothes after arrest was proper, *Arizona v. Gant*, 556 U. S. 332 (129 SC 1710, 173 LE2d 485) (2009), and it was unnecessary for the trial court to apply the "collective knowledge" test. See, e.g., *Brown v. State*, 307 Ga. App. 797, 802 (2) (706 SE2d 170) (2011) (discussing collective knowledge test).

3. Appellant next claims that his federal and state rights against self-incrimination were violated because he was required to turn over his clothes to the police for inspection. Under the Federal Constitution, the protections of the right against self-incrimination are limited to being compelled to testify as "a witness against himself." Fifth Amendment, United States Constitution. This has been interpreted to apply only to "evidence of a testimonial or communicative nature," and not a "comp[ulsion] by the State to produce 'real or physical evidence.' " *Pennsylvania v. Muniz*, 496 U. S. 582, 589 (110 SC 2638, 110 LE2d 528) (1990) (quoting *Schmerber v. California*, 384 U. S. 757, 761-762, n. 6 (86 SC 1826, 16 LE2d 908) (1966)).

Our State Constitution, however, extends this protection further. We have held that the right not to produce evidence against oneself included the right not to be compelled in "the doing of an act against [one's] will to incriminate" oneself. (Punctuation omitted.) *Creamer v. State,* 229 Ga. 511, 517 (3) (192 SE2d 350) (1972). Thus, in Georgia, for example, a suspect cannot be required to place his foot into a footprint left at a crime scene so that police might match the footprint to a shoe. *Day v. State,* 63 Ga. 667 (2) (1879).

Here, appellant did not perform any act against his will to incriminate himself. On the contrary, he surrendered his clothes when asked to do so. Moreover, as we discussed in Division 2, the police were entitled to seize the clothes, which were in his immediate possession, because he had already been lawfully arrested. *Eberhart v. State,* 257 Ga. 600, 602 (2) (361 SE2d 821) (1987) ("[o]nce the appellant was lawfully arrested and in custody, the effects in his possession could be lawfully searched and seized without a warrant") (citing *United States v. Edwards,* 415 U. S. 800 (94 SC 1234, 39 LE2d 771) (1974)). Thus, we find no merit in this claim.

4. Appellant also claims that the clothing seized from him upon his arrest was fungible and that the State should have been barred from introducing that clothing into evidence without proving the chain of custody. However, trial counsel did not object to the admission of appellant's clothing during trial. Therefore, "[o]n this point, we make no decision, not because we think it formidable, but because the court below, so far as we are informed by the record, did not pass upon it." *Jennings v. William W. Wright & Co.,* 54 Ga. 537, 541 (1875).

5. In a tangential claim, appellant asserts that his trial counsel was ineffective for failing to object to the admission of his clothing at trial after a motion to suppress the clothing had been denied.

The standard for evaluating the constitutional effectiveness of counsel was laid out in *Strickland v. Washington,* 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). This standard is "highly deferential" to the "strong presumption that counsel's conduct . . . 'might be considered sound trial strategy.' " Id. at 689. In evaluating a counselor's performance, courts must consider both whether counsel failed to meet the minimum standards of objective professional reasonableness, and whether such deficiencies on the part of counsel actually had a prejudicial effect on the defendant. Id. at 689, 693. Lastly, because both of these requirements must be met, a failure to satisfy either prong of the test is sufficient to defeat a claim of ineffective assistance. Id. at 697.

We need not determine whether the failure to raise a chain of custody objection amounts to deficient performance under *Strickland,* supra, because appellant has not made the requisite showing of

prejudice — i.e., a *reasonable probability* that the outcome of the trial would have been different. *Coleman v. State*, 286 Ga. 291 (6) (687 SE2d 427) (2009). The evidence against appellant was strong: appellant was obsessed with the victim and acted aggressively toward her for several months; the victim was stabbed more than 100 times; and within days of her death, appellant broke into the victim's house on more than one occasion, assaulted and attempted to rape her at knife-point, and repeatedly exclaimed that if he could not have her, then nobody could. Also, a man matching appellant's physical description was seen banging on the victim's door within an hour of her death.

6. At trial, appellant's counsel requested the following charge:

> Whether chain of custody is properly maintained does not go toward the admissibility of the evidence, that is, a chain of custody objection is not proper and can not be used to keep evidence from being admitted at trial.
>
> However, you may consider whether chain of custody was properly maintained when deciding what weight, if any, to give the evidence presented.

The refusal to give a requested instruction will not be deemed reversible error unless the refused request is "a correct statement of law that is pertinent and material to an issue in the case and not substantially covered by the charge actually given. [Cits.]" *Pruitt v. State*, 258 Ga. 583, 588 (13) (373 SE2d 192) (1988). Because the requested charge is an incorrect statement of the law, see *Martin v. State*, 267 Ga. App. 28, 31 (598 SE2d 828) (2004), it cannot be said that the trial court erred in failing to give the requested charge.

7. In his motion for new trial, as in this appeal, appellant raised a claim that trial counsel was ineffective for failing to obtain an expert witness who could testify about the DNA and bite mark evidence gathered at the crime scene. In support of his motion, appellant also requested funds to employ an expert to show that he was prejudiced as a result of trial counsel's failure to acquire such experts. The trial court denied appellant's request for funds at the hearing on the motion for new trial.

At that hearing, trial counsel testified that, as part of his intended trial strategy, he planned to argue that the DNA evidence on appellant's clothing was the result of mishandling or deliberate tampering. Trial counsel also specifically mentioned that he had made a strategic decision to argue that the saliva collected from the victim's breast and hip, and the bite mark on her hip, were merely indicia of the victim's consensual intimate relationship with appel-

lant and did not identify him as her attacker. Thus, in reaching appellant's claim that trial counsel was ineffective in failing to use such an expert, we can simultaneously resolve the claim that he was wrongfully denied funding to obtain expert testimony.

It was trial counsel's strategy to explain away the blood and saliva evidence and the bite marks on the victim rather than directly challenge the findings of the State's expert witness or deny that it was appellant's blood or saliva that were found. Because this trial strategy is objectively reasonable, appellant failed to meet his burden under *Strickland*. It follows that the trial court did not err in refusing to provide funds for expert testimony at the motion for new trial hearing.

8. In his final enumeration of error, appellant alleges that trial counsel was ineffective in failing to effectively impeach Quinn, the State's key witness. Again, this is evaluated under the *Strickland* test as detailed in Division 5, supra.

Here, trial counsel did highlight a number of misstatements and inconsistencies in Quinn's testimony during cross-examination. However, appellant asserts that: (1) Quinn's testimony that appellant had cut the phone lines to her trailer could have been impeached by introducing Quinn's phone records, which clearly showed calls both originating from and received at Quinn's residence during the time the phone lines were supposedly out; (2) Quinn's testimony that Simmons had no other boyfriends at or immediately before the time of the murder was contradicted by statements that Quinn had made to the police at the time, including the names of specific individuals; and (3) Quinn testified that she had been told by police that she was not able to get a warrant to keep appellant off of Quinn's property without Simmons' consent, which contradicted testimony by police officers who claimed to have told Quinn that she could also take out a protective "warrant" against appellant. Appellant asserts that trial counsel's failure to raise these three additional points amounted to an ineffective impeachment of Quinn.

This presents a situation similar to that in *Weathers v. State*, 160 Ga. App. 581 (2) (287 SE2d 565) (1981). There, trial counsel met with defendant Weathers' wife, and she gave him some materials which were exculpatory and which could be used to impeach the State's witnesses against her husband. At trial, counsel made the decision not to use any of the materials provided by Ms. Weathers. He did, however, competently conduct himself in representing his client and in extensively examining (and cross-examining) the witnesses, even without using the impeaching material. The Court of Appeals held that Weathers' counsel was not ineffective even though he could have taken the additional step of impeaching the witnesses after extensive cross-examination. Even though *Weathers* was decided under the

then-current standard of *Pitts v. Glass*, 231 Ga. 638 (203 SE2d 515) (1974), we hold that the same conclusion is appropriate in this case under a *Strickland* analysis. Because, a fortiori, the presentation of some impeaching evidence, but not all of the impeaching evidence a counselor possesses, is stronger than failing to present any impeaching evidence at all, we find that trial counsel's performance in this regard was not deficient.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 12, 2011.

*Amy L. Copeland*, for appellant.

*Tom Durden, District Attorney, Gregory M. McConnell, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Sara K. Sahni, Assistant Attorney General*, for appellee.