304 Ga. 131
FINAL COPY

S18A0176.  STRIPLING v. THE STATE.
S18A0277.  BREWER v. THE STATE.

NAHMIAS, Justice.

Appellants Tshombe Stripling and Elijah Brewer were convicted of malice murder and other crimes in connection with the shooting death of Khaseim Walton.  On appeal, Stripling contends only that the trial court committed plain error by not instructing the jury on the need for accomplice testimony to be corroborated.  Brewer contends that the evidence was insufficient to sustain his conviction for criminal street gang activity and that his trial counsel provided ineffective assistance by failing to call an expert on the smartphone application AirDroid.  We affirm both appellants' convictions.[1]

---

[1] The crimes occurred on November 25, 2013.  On April 8, 2014, a Fulton County grand jury indicted both appellants for malice murder, participation in criminal street gang activity, three counts of felony murder, attempt to commit armed robbery, aggravated assault, possession of a firearm during commission of a felony, and two counts of possession of a firearm by a convicted felon.  The indictment also charged Stripling with several crimes relating to a separate, non-fatal shooting nine days later, in which Brewer did not take part — four counts of aggravated assault, damage to property, possession of a firearm during commission of a felony, and two counts of possession of a firearm by a convicted felon.  The indictment also charged Katrina Shardow and Talib Smith with crimes related to the murder and Shardow with crimes related to the later, non-fatal shooting.

1. (a) Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Walton was a cocaine dealer. Shortly before 9:00 p.m. on November 25, 2013, he drove one of his clients, Gloria Traylor, to a rooming house in the Oakland City area of Atlanta to show her a room that he was planning to rent as a place at which he could sell drugs. As they approached the house, Traylor saw a man she knew as "Chalee" standing outside near a vehicle that looked like a Suburban or a truck. At trial, Traylor identified Talib Smith as Chalee. A short time later, when Walton and Traylor were backing up to leave the house, a man got out of the Suburban-like

Shardow and Talib were tried with the appellants.

The first trial began on February 2, 2015 and ended on February 20. The jury could not reach a verdict on any of the counts related to the fatal shooting. However, Stripling was found guilty of counts related to the non-fatal shooting — three counts of aggravated assault, damage to property, firearm possession during a felony, and one count of firearm possession by a convicted felon; the other aggravated assault count was dismissed, and the firearm possession charge was mistried and then nolle prossed at the second trial. The trial court sentenced Stripling to a total of 45 years in prison based on those guilty verdicts.

The second trial of the appellants and their co-defendants began on May 12, 2015 and ended on May 26. The jury found both appellants guilty of all charges related to the fatal shooting with the exception of one of Stripling's possession of a firearm by a convicted felon counts, which was nolle prossed. Shardow was acquitted of the murder-related charges, with the exception of two firearms charges, and Talib was convicted of all the murder-related charges.

The appellants were both sentenced to life in prison for malice murder, and Stripling was sentenced to a consecutive 35 years and Brewer a consecutive 50 years for the second-trial charges that were not vacated or merged. Both appellants filed timely motions for new trial, which they later amended with new counsel. After separate hearings, the trial court denied Stripling's motion on November 10, 2016 and Brewer's motion on August 18, 2017. The appellants filed timely notices of appeal, and the cases were docketed in this Court for the term beginning in December 2017, submitted for decision on the briefs, and consolidated for opinion.

2

vehicle, approached the driver's side of Walton's car, and asked to buy some drugs. After Walton prepared the cocaine, there was a struggle between him and the man standing outside the car. Traylor then saw three guns pointed in the driver's side window; she heard shots and ducked down. Walton drove into a pole, and Traylor got out of the car screaming. Walton had been shot four times; he died from his injuries soon after he arrived at the hospital. Traylor could not identify the man who asked to buy drugs or any of the people holding the guns.

Paul Whibbey, the manager of the rooming house, looked out his window when he heard a commotion around the time of the shooting. He saw four individuals walking toward Walton's car from a black SUV. Whibbey testified that one had short dreadlocks and another had well-kept dreadlocks. At the time of the shooting, Stripling and Talib had twists or dreadlocks; Brewer did not have dreadlocks. Whibbey heard the people saying "get this, get that, get his money." He saw the man with the well-kept dreadlocks shoot a gun and heard eight or nine shots. Then the four individuals got back in the SUV and left. After the shooting, Whibbey was interviewed by Detective Kevin Leonpacher of the Atlanta Police Department, and he identified Neddrick Smith from a

photo lineup as the shooter.

Neddrick, who had dreadlocks, was arrested and interviewed by the police. He denied any involvement in the shooting. He said that he had driven his Kia sedan to the rooming house that day with his brothers, Nemiyas and Nierris Smith, and Monquel Yancey to buy a heater from someone who lived there, but he had driven away from the house and just arrived at his aunt's house nearby when he heard the shots. He jumped back in his car and returned to the rooming house to investigate. He also said that his brother Talib, who some people say looks like him, may have been involved in the shooting.

Nemiyas and Nierris also were interviewed by Detective Leonpacher, and their interviews were played for the jury after the two brothers testified and said that they did not remember most of what they had said in their interviews. Nemiyas told the detective that when he was outside the rooming house with Neddrick, Nierris, and Yancey before the shooting, he saw Knuckles (Stripling's nickname), Tommy Gunz (Brewer's nickname), Talib, Katrina Shardow, and someone named Pat pull up in a black Jeep and Talib get out. Nemiyas said that

4

all of those people were members of the Bloods gang.[2]  Nierris similarly told

Detective Leonpacher that he saw five people in a Jeep, including Talib,

"Shombe," "Elijah," and a woman; Nierris identified Tshombe Stripling in a

photo lineup as being in the Jeep, but did not identify Elijah Brewer in a lineup.

About a week before the murder, Shardow had rented a black Jeep Cherokee

SUV.  Three weeks after the murder, she reported the SUV stolen; the police

found it on fire a few minutes later.

Eleven shell casings were found at the scene of Walton's shooting, and

ballistics testing showed that they were fired from at least three and as many as

five different .45-caliber guns.  One set of shell casings matched casings left by

the gun Stripling used in a different shooting nine days after the murder.[3]  A cell

phone that belonged to Brewer was found in a driveway at the scene.  Brewer

told his girlfriend that he had dropped the phone when there was a shooting and

he ran.  Cell phone records showed that Brewer, Stripling, and Talib were in

frequent contact and near each other on the day of the shooting, including in

---

[2]  A gang expert testified that a faction of the Bloods known as the Nine Trey Bloods is active in the Oakland City area and commits various violent crimes, including murders and armed robberies.  The gang makes most of its money through robberies, including robberies of drug dealers.

[3]  As discussed above in footnote 1, at the first trial, Stripling was convicted of several counts of aggravated assault as well as other crimes in connection with this later shooting.

5

Oakland City. About 30 minutes after the shooting, Stripling's phone called Neddrick's phone; Neddrick told Detective Leonpacher that this call was from Talib using Stripling's phone.

Stripling did not testify at trial, but Detective Leonpacher testified that Stripling had admitted to him in an interview that Stripling was a member of the Bloods. Stripling claimed that he was in a different part of town around the time of the murder, but his cell phone records did not support that assertion. Brewer testified at trial that he was a member of the Nine Trey Bloods and was part of a group that committed credit card fraud for the gang. He also said that Shardow was a member of the gang and Talib was affiliated with the gang. Brewer claimed that earlier on the day of the murder he had been with Talib, Shardow, and others in the black Jeep SUV later seen at the rooming house, but at the time of the shooting he was at a recording studio in a different area of town. Brewer said that he had taken his cell phone to the studio but at some point that night noticed that it was gone; he suspected that someone took it. Although there were three text messages sent from and five messages received by Brewer's phone in the minutes leading up to the shooting, Brewer claimed that after he lost his phone, he sent text messages using an application on the

6

phone called AirDroid, which lets the user take remote control of the phone and send texts through it without actually possessing it.

(b)    Brewer argues that this evidence was legally insufficient under Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), to sustain his conviction for participation in criminal street gang activity, because the evidence did not show a nexus between the alleged criminal acts and gang activity.  Brewer was charged with participating in criminal gang activity, in violation of OCGA § 16-15-4 (a), through the commission of at least one of the following offenses: murder, felony murder, attempt to commit armed robbery, and aggravated assault.[4]  Proof that "the commission of the predicate act was intended to further the interests of the [gang]" is essential to prove a violation of OCGA § 16-15-4 (a).  Jones v. State, 292 Ga. 656, 659 (740 SE2d 590) (2013).  See also Rodriguez v. State, 284 Ga. 803, 807 (671 SE2d 497) (2009) (explaining that "there must be some nexus between the act and an intent to

_____

[4]  OCGA § 16-15-4 (a) says that "[i]t shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3," which includes "the commission [or] attempted commission [of] . . . [a]ny criminal offense in the State of Georgia . . . that involves violence, possession of a weapon, or use of a weapon . . . " OCGA § 16-15-3 (1) (J).

further street gang activity" (punctuation omitted)).

Brewer admitted that he was a member of the Nine Trey Bloods gang and that he had participated in other criminal activity for the gang. Testimony from Brewer and Detective Leonpacher showed that each of Brewer's co-defendants was in or affiliated with the gang. A gang expert testified that the gang makes most of its money through armed robberies, including robberies of drug dealers like Walton. Other testimony indicated that Walton was seeking to establish a permanent place of business for drug dealing in the Oakland City area, which is where Brewer's gang operates. As a whole, this evidence was sufficient to establish a nexus between the crimes against Walton and an intent to further the interests of the Nine Trey Bloods. See Hayes v. State, 298 Ga. 339, 343 (781 SE2d 777) (2016). Furthermore, when viewed in the light most favorable to the verdicts, the evidence was sufficient to authorize a rational jury to find beyond a reasonable doubt that Brewer and Stripling participated in the aggravated assault, attempted armed robbery, and murder of Walton. See Jackson, 443 U. S. at 319. See also OCGA § 16-2-20 (defining parties to a crime); Johnson v. State, 302 Ga. 774, 776-777 (809 SE2d 769) (2018) ("[S]hared criminal intent may be inferred from the person's conduct before, during, and after the crime."

(citation and punctuation omitted)); Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

(c)     Although Brewer and Stripling do not dispute the sufficiency of the evidence supporting their other convictions, we have reviewed the record and conclude that the evidence presented at trial and summarized above was also sufficient to authorize a rational jury to find the appellants guilty beyond a reasonable doubt of those crimes.

2.     Stripling's only contention on appeal is that the trial court committed plain error by failing to instruct the jury under OCGA § 24-14-8 that the testimony of an accomplice must be corroborated to establish a fact.[5]

---

[5] OCGA § 24-14-8 says:
   The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.
This provision was carried forward from Georgia's old Evidence Code, see former OCGA § 24-4-8, and has no analogue in the Federal Rules of Evidence, so we give the new accomplice corroboration provision the same meaning as the old one. See Bradshaw v. State, 296 Ga. 650, 653-654 (769 SE2d 892) (2015).

Because Stripling did not request this instruction at trial,

> his claim is reviewed on appeal only for plain error, meaning that we will reverse the trial court only if the [alleged] instructional error was not affirmatively waived . . . , was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings.

Saffold v. State, 298 Ga. 643, 650 (784 SE2d 365) (2016) (citation and punctuation omitted).  See also OCGA § 17-8-58 (b).  We need not analyze all of the elements of this test, because it was not obvious error for the trial court to omit an accomplice corroboration instruction under the circumstances of this case.

A jury instruction on the need for accomplice corroboration should be given if there is "slight evidence to support the charge."  Hamm v. State, 294 Ga. 791, 794 (756 SE2d 507) (2014).  An accomplice is someone who shares a common criminal intent with the actual perpetrator of a crime.  See Williams v. State, 289 Ga. 672, 673 (715 SE2d 76) (2011).  See also OCGA § 16-2-20. Stripling now argues that there was evidence that Neddrick, Nemiyas, and Nierris Smith, all of whom testified for the State, were his accomplices because there was evidence that they were involved in the fatal shooting.  Stripling is

10

correct that there was at least slight evidence that all three of those men were involved in the murder. Neddrick was identified as the shooter by an eyewitness, and there was evidence that Nemiyas and Nierris were with Neddrick before, during, and after the shooting. But Appellant is incorrect that this evidence could be construed to support the finding that those men were *his* accomplices.

The evidence showed that Neddrick, Nemiyas, and Nierris were in and around one vehicle (a sedan) around the time of the shooting, while Stripling and his co-defendants were in and around another vehicle (an SUV). There was no evidence that Neddrick, Nemiyas, or Nierris committed the crimes charged *with* Stripling and any of his co-defendants.[6] Based on the evidence presented at trial, if Neddrick, Nemiyas, and Nierris committed the crimes, they would be guilty and Stripling would be completely innocent. Stripling cites no precedent requiring an accomplice corroboration instruction under similar circumstances. Accordingly, the trial court did not commit plain error in not giving that charge.

---

[6] One of Neddrick's *other* brothers (Talib Smith) was one of Stripling's co-defendants; there was evidence that Talib looked like Neddrick, which could explain the eyewitness identification. Although the evidence indicated that Talib used Stripling's phone to call Neddrick's phone 30 minutes after the shooting, there was no evidence that Talib and his brothers acted together in carrying out the murder and other crimes against Walton.

See Simmons v. State, 299 Ga. 370, 374 (788 SE2d 494) (2016) ("'[A]n error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point . . . .'" (citation omitted)). See also Coleman v. State, 227 Ga. 769, 770 (183 SE2d 379) (1971).[7]

3.      Other than the sufficiency of the evidence claim discussed in Division 1 (b) above, Brewer's only contention on appeal is that his trial counsel provided ineffective assistance by failing to call an expert to testify that text messages can be sent from a smartphone remotely using the application AirDroid.

(a)      As the summary of the evidence in Division 1 (a) above indicates, the finding of Brewer's cell phone at the crime scene was an important component of the proof that he was a participant in the crimes. The State argued that the jury should infer that Brewer was in possession of his phone at the crime scene, an inference strengthened by the evidence that there were three text

---

[7]      Brewer also testified, and there was substantial evidence that he was Stripling's accomplice, but Brewer's testimony did not directly implicate Stripling. Stripling does not argue that the trial court committed plain error by failing to give an accomplice corroboration instruction as to Brewer's testimony, perhaps because such an argument would fail as Stripling could not show that the lack of such an instruction affected the outcome of the trial. See Lyman v. State, 301 Ga. 312, 319 (800 SE2d 333) (2017). Stripling's other co-defendants, Talib Smith and Katrina Shardow, may also have qualified as his accomplices, but neither testified at trial.

messages sent from the phone in the minutes before the shooting. According to Brewer, however, he could have sent those three messages using the application AirDroid, which allows a user to remotely control a smartphone.

Brewer decided to testify at trial. On direct examination, he admitted that he smoked marijuana, was a member of the Nine Trey Bloods, and had been involved in a credit card fraud scheme for the gang. Brewer's counsel also questioned him about AirDroid. Brewer explained that he could use another electronic device to connect to AirDroid and then make calls and send text messages from his phone remotely. He testified that he had used AirDroid on his iPod to send texts from his phone on the night of the murder. He was not asked, however, if he used AirDroid to send the three texts from his phone just before the murder. Earlier in the trial, Brewer's counsel asked Detective Leonpacher, who had testified to his knowledge and experience working with cell phones, if he was familiar with AirDroid; the detective said that he had never heard of AirDroid but he had heard of applications, like iCloud, which allow users to send messages over the Internet but do not actually take control of the smartphone and make calls or send messages from the phone. Brewer's counsel also asked the two phone company employees whom the State called to

authenticate cell phone records about the existence of programs that allow a smartphone to be controlled remotely; the Sprint employee testified that there are applications, like iCloud, that let the user send text messages without possessing the phone, and the T-Mobile employee echoed that testimony but explained that those applications do not use the phone networks, so messages sent using them would not show up on the cell phone records.

At the motion for new trial hearing, Brewer's appellate counsel called Stuart Smith, an expert in Android application coding and functionality. Consistent with Brewer's testimony at trial, Smith testified that the AirDroid application allows a smartphone to be controlled remotely and that the user can send text messages from the phone without being in possession of the phone, unlike the iCloud-type applications about which Detective Leonpacher and the phone company employees had testified. Smith acknowledged, however, that he could not say whether Brewer was actually operating his phone remotely when the three texts at issue were sent.

(b)     Brewer contends that his trial counsel's decision to rely on him to explain AirDroid to the jury, rather than calling an expert like Smith, deprived him of the effective assistance of counsel. To prove such an ineffective

14

assistance claim, an appellant must prove both that his counsel's performance was professionally deficient and that, but for the unprofessional performance, there is a reasonable probability that the outcome of the proceeding would have been different. See Strickland v. Washington, 466 U. S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). We need not review both elements of this test if the appellant fails to prove one of them. See Matthews v. State, 301 Ga. 286, 288 (800 SE2d 533) (2017).

> It is well established that the decision as to which defense witnesses to call is a matter of trial strategy and tactics. And tactical errors in that regard will not constitute ineffective assistance of counsel unless those errors are unreasonable ones no competent attorney would have made under similar circumstances. . . . Moreover, [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Brown v. State, 292 Ga. 454, 456-457 (738 SE2d 591) (2013) (citation and punctuation omitted).

The decision by Brewer's trial counsel not to call an AirDroid expert was not so unreasonable that no competent attorney would have made it under the circumstances. Trial counsel testified at the motion for new trial that he thought Brewer was a strong witness and could effectively explain AirDroid, which

Brewer did; Brewer's testimony at trial was consistent with Smith's testimony at the motion for new trial hearing and conveyed to the jury the essential point that text messages he sent using AirDroid would actually be sent from his phone, not just from the Internet. Brewer asserts that the jury would not have believed his description of AirDroid because his admission of past drug use and criminal activity with the gang undermined his credibility. Trial counsel, however, explained that he believed that if Brewer admitted his past involvement in non-violent crimes on direct examination, the jury would see that Brewer was not the "muscle" of the gang and would perceive him as honest for admitting to such conduct. This was not an unreasonable approach, particularly because the expert could not say whether in fact Brewer used AirDroid to send the three text messages at issue.[8]

Brewer also argues that an expert was required to rebut the testimony of the detective and the phone company witnesses that applications like iCloud merely allow users to send messages over the Internet. However, the testimony of the State's witnesses did not contradict Brewer's testimony. Those witnesses

---

[8] We note that Brewer, who could have testified to that key fact, did not, and his girlfriend's testimony that he told her he had dropped his phone while running away after a shooting undermined his AirDroid theory.

spoke in generalities about applications they knew about. Detective Leonpacher was the only witness Brewer asked about AirDroid, and the detective said he had not heard of that application. Thus, the testimony of all three witnesses left open the possibility that a different application — one with which they were not familiar, but Brewer was — allowed remote control of Brewer's phone. Brewer's counsel also challenged the State's theory by cross-examining a crime scene technician about her failure to find the cell phone initially — she had to be called back to the scene to collect it — and cross-examining Detective Leonpacher about the delay in finding the phone and the failure to test it for fingerprints.

Under these circumstances, considered without the distorting effects of hindsight, trial counsel's decision not to call an AirDroid expert was not patently unreasonable, and Brewer's ineffective assistance claim therefore fails. See Matthews, 301 Ga. at 289; Simpson v. State, 289 Ga. 685, 689-690 (715 SE2d 142) (2011).

Judgments affirmed. All the Justices concur.

Decided June 29, 2018.

Murder. Fulton Superior Court. Before Judge Ellerbe.

Michael W. Tarleton, for appellant (case no. S18A0176).

Steven E. Phillips, for appellant (case no. S18A0277).

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Arthur C. Walton, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Aimee F. Sobhani, Assistant Attorney General, for appellee.