**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**March 3, 2021**

# In the Court of Appeals of Georgia

A20A1911. HARTMAN v. THE STATE.

MERCIER, Judge.

Following a jury trial, Devin Hartman was convicted of rape and aggravated sodomy. Hartman appeals the denial of his motion for new trial, arguing that the evidence was insufficient to support his aggravated sodomy conviction. He also claims that the trial court improperly admitted extrinsic act evidence, that he received ineffective assistance of counsel at trial, and that the trial court erred in failing to turn the victim's psychiatric records over to the defense. Finding no error, we affirm.

1. On appeal from a criminal conviction, we construe the evidence in the light most favorable to the verdict, and the defendant no longer enjoys a presumption of innocence. See *Robinson v. State*, 342 Ga. App. 624, 625 (805 SE2d 103) (2017). So viewed, the evidence shows that Hartman created an online profile on the

OKCupid.com dating website with an email address registered under the name "Zach Anderson." The victim, J. L., also had a profile on the OKCupid site, where she hoped to meet people and find a relationship. Using the Zach Anderson name, Hartman contacted J. L. through the site. They sent messages back and forth, talked by telephone, and eventually decided to go out on a date.

Hartman and J. L. met at a restaurant in midtown Atlanta on the afternoon of June 20, 2014. Over the course of approximately five hours, the two talked and drank beers on the restaurant's outdoor patio. J. L. recalled that she had no more than six beers, which was not an "abnormally large number" given the length of time they were there. The conversation was good, and J. L. thought the date was going well.

At one point, J. L. went to the restroom, leaving her drink on the table with Hartman. She returned to the table, and they continued to socialize, but she remembered little about the end of the date. According to J. L, her memory was perfectly clear up to the point she saw the bill on the table, then it faded. She vaguely recalled seeing her car later that evening and feeling strange in a way similar to vertigo. She did not, however, feel drunk.

J. L.'s next memory was waking up suddenly and scared on the doorstep of her condominium in the middle of the night. She could not remember how she had gotten

2

home, and her underwear was missing. She also could not find her phone or keys. Thinking that "something bad had happened," she ran first to a nearby restaurant, then to a motel, where she stayed until approximately 8:00 a.m. the next morning. During the night, she began to feel vaginal and rectal pain, noting that her "whole bottom just hurt" and her vaginal region was "burning." She also realized that she was bleeding heavily from her vagina, even though she was not menstruating at the time, and she had blood on her rectum.

Not knowing what had happened, but believing that she had been assaulted, J. L. called a friend from the hotel and asked her to email Hartman to find out whether he had J. L.'s keys and cell phone. Hartman replied that he did not. J. L. called her father, who met her at her condominium with a spare set of keys. Inside her condominium, she searched the internet for "what do you do when you've been raped" and followed the instructions she found, including placing her clothing in a paper bag. She also discovered a charge on her credit card from the previous night that she assumed to be for a cab ride. She emailed Hartman, explained that she did not have her keys or phone, and asked whether he could help her find her car. Hartman responded that he was leaving town for the day and could not help, but that she had taken her keys and phone as she "got out of the car." When J. L. remarked that she

3

was having trouble remembering the previous night, Hartman replied: "You went to your car. I did not drive you home. And other than kiss, no." They continued to email throughout the morning. J. L. stated that she feared she had been raped and asked whether she had appeared drunk. Hartman replied that she had not seemed "drunk or out of it."

Later that day, J. L. told her family that she thought she had been raped, and she went to the hospital for a sexual assault examination. The doctor who performed the exam found tenderness in the vaginal area, but no bruising or lacerations. He also saw no rectal tears or bleeding. A gynecological exam conducted a few days later revealed bruising on J. L.'s right buttock and external vaginal trauma that likely would not have been visible immediately after the assault.

At the hospital, a detective with the Atlanta Police Department spoke with J. L., who indicated that she had been on a date the night before and provided the detective with Hartman's cell phone number. She also stated that her cell phone was missing. The detective obtained video footage from security cameras in the area around the restaurant, which showed that J. L. left the restaurant just before 8:30 p.m. and, approximately one hour later, got out of a Ford Explorer. Around that time, a security guard found her sitting outside of a nearby office building, appearing

4

sluggish and "a little out of it." She did not, however, smell like alcohol. The security guard helped her into a cab, and she was able to provide her address to the driver, who took her home.

On the same day that J. L. reported the assault, a passer-by found her cell phone on the ground near the Moores Mill exit off of Interstate 75. Using cell phone mapping technology, police determined that Hartman's cell phone was near the Moores Mill exit at 9:40 pm on June 20, 2014, and another woman he was dating testified that he came to her home located off of the exit that night. Vehicle records also showed that Hartman owned a Ford Explorer.

Vaginal and rectal swabs taken during J. L.'s sexual assault examination contained Hartman's DNA. Suspecting that J. L. had been given a "date rape drug," authorities tested blood drawn from her during the exam for GHB (Gamma-Hydroxybutyrate). Although the GHB test was negative, the State offered expert testimony that GHB can only be detected in a person's blood for a few hours after ingestion. The expert further testified, based on his review of the security camera footage and witness statements, that in his opinion J. L. was under the influence of GHB on June 20, 2014.

The State also offered extrinsic act testimony from six women who met Hartman (posing as "Zach Anderson") through internet dating websites. Two of the women (A. H. and K. C.) asserted that Hartman had expressed a desire to have sexual intercourse with a sleeping, immobile woman, and he asked each to help him fulfill that fantasy. Hartman also asked A. H. and K. C. to engage in anal sex with him. In addition, four other women (S. F., E. P., A. B., and K. N.) alleged that Hartman had drugged and/or sexually assaulted them.

Based on the evidence presented, the jury found Hartman guilty of aggravated sodomy and rape. He now challenges the sufficiency of the evidence supporting his aggravated sodomy conviction, arguing that the State failed to prove the elements of sodomy and force. In reviewing this challenge, we do not weigh the evidence or resolve issues of witness credibility, but merely determine whether the evidence was sufficient for the jury to find Hartman guilty beyond a reasonable doubt. See *Robinson*, supra at 628 (1).

The crime of aggravated sodomy occurs when "[a] person . . . commits sodomy with force and against the will of the other person[.]" OCGA § 16-6-2 (a) (2). Sodomy constitutes "any sexual act involving the sex organs of one person and the mouth or anus of another." OCGA § 16-6-2 (a) (1). The evidence shows that J. L.

6

could not remember what happened as her date with Hartman ended. After the date, however, her rectum was painful and bleeding. Rectal swabs, which J. L. testified had been placed inside her rectum, were positive for Hartman's DNA, and her buttock was bruised. Moreover, the evidence — including the expert testimony presented by the State — supports the conclusion that Hartman drugged J. L. on June 20, 2014.

Given these circumstances, the jury was authorized to find that Hartman sodomized J. L. forcibly and against her will. Although he argues on appeal that the record contains no proof of force, evidence regarding the pain and bleeding J. L. suffered was relevant to force. See *Robinson*, supra at 631 (2); see also *Handley v. State*, 352 Ga. App. 106, 108 (834 SE2d 114) (2019) (The term "force" in the sexual assault context means "acts of physical force, threats of death or physical bodily harm, or mental coercion, such as intimidation such as would be sufficient to instill in the victim a reasonable apprehension of bodily harm, violence, or other dangerous consequences to (oneself) or others." (citation and punctuation omitted)). The jury also could have concluded that Hartman surreptitiously gave J. L. a drug "with the intent of rendering [her] incapable of resisting his sexual advances," a finding that sufficiently establishes the force required for aggravated sodomy. Id. at 109. Compare *Thurmond v. State*, 353 Ga. App. 506, 510 (838 SE2d 592) (2020) (insufficient

7

evidence to demonstrate force needed for aggravated sodomy where victim was asleep during assault after *voluntarily* consuming excessive amounts of alcohol). The evidence, therefore, was sufficient.

2. Hartman claims that the trial court erred in admitting extrinsic act evidence from the six women at trial. The record shows that the evidence involving A. H. and K. C. was admitted under OCGA § 24-4-404 (b), while testimony relating to S. F., E. P., A. B., and K. N. was admitted under OCGA § 24-4-413. We find no error in the admission of this evidence.

(a) *Evidence admitted pursuant to OCGA § 24-4-404 (b)*. Generally, "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith." OCGA § 24-4-404 (b). Extrinsic act evidence may, however, be admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. Before a trial court admits evidence under OCGA § 24-4-404 (b),

> the moving party must show that: (1) the evidence is relevant to an issue other than the defendant's character, (2) the probative value is not substantially outweighed by undue prejudice under OCGA § 24-4-403,

8

and (3) there is sufficient proof so that the jury could find that the defendant committed the acts.

*Whaley v. State*, 343 Ga. App. 701, 706-707 (3) (a) (808 SE2d 88) (2017).

The trial court admitted evidence of Hartman's interactions with A. H. and K. C. for the limited purpose of showing motive. On appeal, Hartman argues that this evidence "served only to besmirch his character, was irrelevant, and was far more prejudicial than probative." We disagree.

"Motive is the reason that nudges the will and prods the mind to indulge the criminal intent, and is an entirely proper purpose to admit evidence of extrinsic acts." *Whaley*, supra at 707 (3) (a) (i) (citations and punctuation omitted). Overall similarity between the charged crime and the extrinsic act need not be shown when the act is presented to prove motive. See id. Instead, the extrinsic act evidence is admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id (citation, punctuation, and emphasis omitted).

Both A. H. and K. C. testified that Hartman (acting as Zach Anderson) asked them to take part in his sexual fantasy of having intercourse with an immobile, sleeping woman and to engage in anal sex. K. C. also provided testimony regarding

9

her lengthy relationship with Hartman, including his dishonesty regarding his identity. The trial court was authorized to find such evidence relevant to Hartman's motive to (1) arrange a date with J. L. under false pretenses; (2) incapacitate her; and (3) engage in vaginal and anal intercourse with her while she was incapacitated.

We also cannot agree with Hartman that the evidence was unduly prejudicial. "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. Such exclusion, however, is an extraordinary remedy that should only be used sparingly. See *Whaley*, supra at 708 (3) (a) (ii).

Given J. L.'s memory lapse on June 20, 2014, as well as defense counsel's extensive attacks on her credibility, the motive evidence provided by A. H. and K. C. was highly important to the State's case. See *Whaley*, supra (probative value depends upon, among other things, the need for the evidence). Specifically, it helped explain why — according to the State — Hartman acted as he did. See *Smart v. State*, 299 Ga. 414, 419 (2) (b) (788 SE2d 442) (2016) (testimony regarding defendant's prior acts of domestic abuse was probative to why defendant "lashed out against his wife"). We

10

recognize that the evidence was detrimental to the defense. But its probative value outweighed any danger of unfair prejudice, particularly in light of the trial court's limiting instruction to jurors. See *Virger v. State*, 305 Ga. 281, 295 (7) (c) (824 SE2d 346) (2019) (probative value of evidence not outweighed by undue prejudice "particularly in light of the trial court's limiting instruction"); see also *Smart*, supra ("While the evidence against Appellant was prejudicial — as almost all evidence presented by the State will be — on balance, we agree with the trial court that the probative nature of [the extrinsic act] testimony outweighed that prejudice."). The trial court did not abuse its discretion in admitting the evidence relating to A. H. and K. C. See *Bradshaw v. State*, 296 Ga. 650, 656 (3) (769 SE2d 892) (2015) (reviewing the admission of evidence under OCGA §§ 24-4-403 and 24-4-404 for clear abuse of discretion).

(b) *Evidence admitted under OCGA § 24-4-413*. Hartman also argues that the trial court erred in admitting the evidence involving S. F., E. P., A. B., and K. N. under OCGA § 24-4-413 (a), which provides: "In a criminal proceeding in which the accused is accused of an offense of sexual assault, evidence of the accused's commission of another offense of sexual assault shall be admissible and may be considered for its bearing on any matter to which it is relevant." The statute creates

11

a "rule of inclusion," with a strong presumption in favor of admissibility. See *Dixon v. State*, 341 Ga. App. 255, 258 (1) (800 SE2d 11) (2017).

(i) Hartman first claims that the allegations raised by E. P. and A. B. did not involve a sexual assault. The trial court, however, was not required to make a preliminary determination that a sexual assault actually occurred before admitting the evidence. See *Dixon*, supra 259 (1) (a). The key question was whether "a jury could find by a preponderance of the evidence" that the defendant committed another sexual assault. Id.

E. P. alleged that Hartman drugged her drink at some point during their date, then took her to his car, reclined the passenger seat, and told her to "relax" while he drove her back to her car. E. P.'s next memory was waking up confused and disoriented, with Hartman kissing her. She noticed that her pants were pulled down in the back and that the strap of her purse, which she had been wearing across her body, was broken.

E. P. admittedly did not know exactly what happened that night because she was "unconscious." But OCGA § 24-4-413 (d) defines the term "offense of sexual assault" broadly, encompassing conduct or the attempt to engage in conduct that would constitute various sexual crimes, including rape (OCGA § 16-6-1), sodomy

12

(OCGA § 16-6-2), and sexual battery (OCGA § 16-6-22.1). And a reasonable jury could conclude that Hartman committed — or attempted to commit — a non-consensual, illegal sexual act on E. P. after drugging her and rendering her incapacitated. See, e.g., OCGA § 16-6-22.1 (b) ("A person commits the offense of sexual battery when he or she intentionally makes physical contact with the intimate parts of the body of another person without the consent of that person."); OCGA § 16-6-22.1 (a) ("For the purposes of this Code section, the term 'intimate parts' means the primary genital area, anus, groin, inner thighs, or buttocks of a male or female and the breasts of a female."); OCGA § 16-4-1 ("A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime.").

We reach a similar conclusion as to A. B., who testified that Hartman drove her to a darkened church parking lot after a date to have sex. Uncomfortable with the situation, she indicated that she did not want to have intercourse. Hartman ignored her wishes, becoming aggressive, pushing her seat back, ripping her skirt, grabbing her arm and leg, and forcing her to have sex. Although A. B. could not remember explicitly telling Hartman "no" during the encounter, a jury would have been authorized to conclude that he raped her. See OCGA § 16-6-1 (a) (1) ("A person

13

commits the offense of rape when he has carnal knowledge of . . . [a] female forcibly and against her will[.]").

(ii) Hartman does not question that the allegations presented by S. F. and K. N. rose to the level of sexual assault. Specifically, S. F. testified that Hartman drugged and had intercourse with her without her consent. K. N. alleged that Hartman aggressively and forcibly had sex with her after she repeatedly said "no." Instead, he argues that the probative value of this evidence was outweighed by the risk of undue prejudice, confusion of the issues, or misleading of the jury, requiring its exclusion under OCGA § 24-4-403.

Again, however, whether to exclude evidence on these grounds is generally a matter "committed principally to the discretion of the trial courts[.]" *Dixon*, supra at 260 (1) (b) (citation and punctuation omitted). "In close cases, the balance should be struck in favor of admissibility." Id. (citation and punctuation omitted). The evidence shows that J. L. could not remember what happened to her after she left the restaurant on June 20, 2014, creating a need for circumstantial evidence. And as noted above, Hartman vigorously challenged J. L.'s veracity. Under these circumstances, the trial court, which instructed the jury about the limited nature of the OCGA § 24-4-413 evidence, did not abuse its discretion in finding that the probative value of the

14

evidence outweighed any risk of undue prejudice, confusion, or misleading of the jury. See id. at 262 (1) (b).

3. Hartman claims that he received ineffective assistance of counsel at trial. To prevail on this claim, Hartman must show that trial counsel's performance was deficient and that the deficiency prejudiced his defense. See *Wofford v. State*, 305 Ga. 694, 696 (2) (827 SE2d 652) (2019). With respect to the deficiency prong, Hartman must demonstrate that counsel "performed his duties at trial in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." Id. To prove that he was prejudiced by deficient performance, Hartman must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (citation and punctuation omitted). Hartman has not made the necessary showing here.

(a) Hartman argues that counsel failed to adequately cross-examine and impeach J. L. regarding her injuries, her inconsistent statements, and her motives to lie. The record shows, however, that counsel cross-examined J. L. extensively, exploring subjects such as the text messages she sent, the amount of alcohol she drank during the date, the lack of blood on the dress she had been wearing, her failure

15

to initially tell doctors and police that she had been bleeding, and inconsistencies in how she described her injuries to friends.

On appeal, Hartman asserts that the cross-examination could have been conducted more effectively, particularly if defense counsel had been more familiar with the courtroom technology and had used that technology when impeaching J. L. But it appears that defense counsel ultimately succeeded in presenting the impeaching evidence about which Hartman specifically complains (involving whether J. L.'s phone was protected by a passcode). And decisions regarding the scope and extent of cross-examination are inherently grounded in trial tactics and strategy. See *Mathis v. State*, 309 Ga. 110, 116 (2) (b) (844 SE2d 736) (2020). Such decisions "do not amount to deficient performance unless they are so unreasonable that no competent attorney would have made them under similar circumstances." *Gaston v. State*, 307 Ga. 634, 642 (2) (d) (837 SE2d 808) (2020) (citation and punctuation omitted).

Defense counsel impeached J. L. on several fronts, highlighted her inconsistent statements in closing argument, and painted her as a liar. Although Hartman claims that counsel should have pursued additional avenues of impeachment, "a claim of ineffective assistance of counsel is judged by whether counsel rendered reasonably effective assistance, not by a standard of errorless counsel or by hindsight." *Leopold*

16

*v. State*, 324 Ga. App. 550, 557 (1) (d) (751 SE2d 184) (2013). Even if counsel failed to challenge certain parts of J. L.'s testimony, we cannot deem his cross-examination deficient. See *Simpson v. State*, 289 Ga. 685, 691 (8) (715 SE2d 142) (2011) ("Because, a fortiori, the presentation of some impeaching evidence, but not all of the impeaching evidence a counselor possesses, is stronger than failing to present any impeaching evidence at all, we find that trial counsel's performance in this regard was not deficient.").

Moreover, given trial counsel's extensive cross-examination of J. L., Hartman cannot show a reasonable probability that additional cross-examination would have impacted the outcome of the trial. See *Leopold*, supra (finding no reasonable probability that additional impeachment of a witness would have altered the trial result). Accordingly, this ineffective assistance claim lacks merit. See *Simpson*, supra; *Leopold*, supra.

(b) Hartman argues that defense counsel's failure to understand various exceptions to Georgia's Rape Shield law (OCGA § 24-4-412) constituted ineffective assistance of counsel. Again, we disagree.

(i) First, Hartman claims that trial counsel could have impeached J. L. with evidence that she drunkenly kissed a stranger at a bar a few days before she met

17

Hartman. As discussed in Division (3) (a), however, defense counsel extensively impeached J. L., and Hartman has not demonstrated a reasonable probability that *additional* impeachment evidence would have impacted the trial. Even if trial counsel could have impeached J. L. with this evidence, therefore, counsel's failure to do so will not support an ineffective assistance claim. See *Leopold*, supra.

(ii) Hartman further argues that defense counsel mistakenly believed that OCGA § 24-4-412 prevented him from introducing evidence of J. L.'s "longstanding history of hemorrhoids and anal fissures[.]" In Hartman's view, such evidence would have established that J. L. had "a preexisting condition" that countered her claim of rectal pain following the incident. Hartman, however, has pointed to no evidence that J. L. exhibited any "anal fissures" immediately after the assault. We fail to see, therefore, how evidence regarding her prior history of fissures would have impacted the case.

Similarly, we find no prejudice with respect to J. L.'s history of hemorrhoids. When asked about "long term pain" she experienced following the assault, J. L. testified that she has "hemorrhoids very frequently." But she never specifically related this condition to the sodomy. And she testified about the immediate rectal pain and bleeding she suffered following her date with Hartman. Under these circumstances,

18

Hartman has not shown that further evidence regarding hemorrhoids would have altered the trial outcome.

(iii) Before trial, the trial court granted the State's motion in limine to exclude evidence that J. L. tested positive for genital herpes on July 14, 2014, approximately three weeks after the incident here. Hartman now claims that counsel was ineffective in failing to argue that evidence of J. L.'s sexually transmitted disease was admissible as an alternate explanation for several symptoms that she attributed to the assault, such as painful urination. Hartman, however, has pointed to no evidence regarding when J. L. contracted herpes or whether, at the time she experienced these symptoms, she was suffering from a herpes outbreak that could have produced similar symptoms. Accordingly, he has not demonstrated that the circumstances supported such an argument from defense counsel or that counsel was deficient in failing to raise it. See generally *Burke v. State*, 316 Ga. App. 386, 389 (1) (a) (729 SE2d 531) (2012) ("Failure to make a meritless or futile objection or motion cannot be evidence of ineffective assistance." (citation and punctuation omitted)).

(c) At trial, defense counsel presented expert testimony from James Woodford, a forensic chemist who testified — based on witness statements, medical records, and the security camera video of J. L.'s movements after leaving the restaurant — that he

saw no evidence that J. L. was under the influence of GHB. Hartman now argues that counsel failed to properly prepare Woodford for trial and did not adequately question him. He further claims that trial counsel should have chosen a different expert to testify. None of these claims supports reversal.

(i) Hartman complains that defense counsel failed to provide Woodford with the security video of J. L.'s movements prior to trial. Woodford testified that he had not been given the video to review before trial commenced.[1] But Woodford explained at trial that he was able to write his pre-trial expert report without seeing the video, and he watched the video just before he testified. Hartman has not shown that the expert was unprepared for trial.

(ii) Similarly, Hartman has not demonstrated that trial counsel provided ineffective assistance by failing to ask Woodford about medication J. L. was taking or how alcohol might have impacted her memory. Although Hartman suggests that such testimony would have been helpful to his defense, he did not call Woodford as a witness at the hearing on his motion for new trial, and we do not know how Woodford would have responded to such questions. Accordingly, Hartman has not

---

[1] Defense counsel refuted this claim at the hearing on Hartman's motion for new trial, stating that he sent the video to Woodford before trial.

shown that trial counsel performed deficiently on this ground. See *Wofford*, supra at 697 (2) (a) ("In the absence of any evidence that the [witness] could have offered favorable testimony at trial, [defendant] cannot show that his lawyer rendered ineffective assistance when he failed to elicit such testimony.").

(iii) Finally, Harman claims that counsel was deficient in offering a chemist — rather than a pharmacologist — as an expert in this case. At the motion for new trial hearing, Hartman presented testimony from Randall Tackett, a pharmacology expert who, in his view, would have been a better choice as an expert at trial. When asked about his expert selection process, however, trial counsel explained that he knew Tackett personally and had used him in prior cases, but decided to hire Woodford for this case. Counsel testified that he had employed Woodford more often as an expert and was comfortable that "Dr. Woodford could cover the same thing that Dr. Tackett could."

Decisions regarding whether to present expert testimony, "like other decisions about which defense witnesses to call, [are] a matter of trial strategy that, if reasonable, will not sustain a claim of ineffective assistance." *Horton v. State*, 310 Ga. 310, 330 (5) (b) (849 SE2d 382) (2020) (citation and punctuation omitted). Although Hartman argues that Tackett would have been a better choice as an expert

21

here, he has not demonstrated that hiring Woodford over Tackett was unreasonable. See *Horton*, supra; see also *Sullivan v. State*, 308 Ga. 508, 512-513 (2) (b) (842 SE2d 5) (2020) ("[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (citation and punctuation omitted)).

(d) Next, Hartman complains that trial counsel failed to question J. L. about the possibility that she might bring a civil lawsuit relating to the incident and thus had a motive to lie and/or to exaggerate her symptoms. It appears that at some point *after* the jury reached its verdict in this case, J. L. sued the owner of OKCupid.com. Hartman, however, has not demonstrated that trial counsel knew J. L. planned to sue OKCupid's owner,[2] and we find no merit in his hindsight claim that counsel should have questioned J. L. about the possibility of such suit. See generally *Sullivan*, supra. Moreover, as discussed in Division 3 (a), Hartman has not demonstrated a reasonable probability that additional impeachment evidence relating to J. L. would have altered

---

[2] During trial, defense counsel objected to evidence presented by the State regarding ongoing trauma suffered by J. L., asserting that the testimony might be relevant in a civil trial for damages, but had no "probative value toward the case, the alleged crime here." Such objection does not demonstrate that counsel knew about J. L.'s yet-to-be-filed civil lawsuit against OKCupid's owner.

22

the trial outcome. He thus cannot show prejudice from this alleged deficiency. See *Leopold*, supra.

(e) Hartman criticizes trial counsel for not requesting a patten jury charge on "mistake of fact." The record shows, however, that the State asked the trial court to instruct the jury on "mistake of fact," but the trial court denied the request after finding the charge inapplicable to the case. Hartman has not enumerated the trial court's ruling as error. And given the State's request, we cannot conclude that trial counsel's failure to request the charge harmed Hartman.

(f) Hartman argues that trial counsel's alleged errors, if considered cumulatively, constitute ineffective assistance. But we only evaluate "the effects of matters determined to be error, not the cumulative effect of non-errors." *Lanham v. State*, 345 Ga. App. 657, 665 (1) (f) (813 SE2d 184) (2018) (citation and punctuation omitted). And "even if trial counsel was deficient in some respects, there is no reasonable probability that, but for those deficiencies, the outcome of [Hartman's] trial would have been different, for all of the reasons previously discussed." Id. (citation and punctuation omitted).

4. Well after Hartman's trial concluded, post-conviction counsel requested that the trial court examine J. L.'s psychiatric records in camera and provide the defense

23

with any relevant, non-privileged information that might impeach or call into question J. L.'s credibility. The trial court reviewed the records, but did not turn any evidence over to Hartman, evidently finding nothing exculpatory in the material. Hartman enumerates this ruling as error, asserting that he "believes" exculpatory evidence exists and that we should review the sealed records on appeal.

According to Hartman, he requested access to J. L.'s psychiatric information "to determine whether [trial counsel] was ineffective for failing to procure and use these records" at trial. Hartman, however, has not alleged on appeal that counsel was ineffective for this reason, and he has not explained how these records would help him at this point. More importantly, "[t]his Court will not review an in camera inspection conducted by the trial court based on speculation that there might be additional material which should have been found and produced for the defense." *Dunagan v. State*, 255 Ga. App. 309, 312 (4) (565 SE2d 526) (2002). "The trial court's discretionary ruling after an in camera inspection that all exculpatory material, if any, has been produced establishes that as a fact absent a countershowing." Id.

Hartman bore the burden of showing what was suppressed and how that evidence was materially exculpatory. See *Dunagan*, supra. He has not met this

24

requirement, relying solely on speculation about what *might* be in the psychiatric records. Accordingly, he has not demonstrated that the trial court erred. See id.

*Judgment affirmed. Miller, P. J., and Senior Appellate Judge Herbert E. Phipps, J., concur*.